**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **FLINT EMERGENCY MEDICINE, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:12-CV-105 (MTT)** |
| ) | |
| **MACON COUNTY MEDICAL CENTER,** ) | |
| **INC. d/b/a FLINT RIVER HOSPITAL,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## ORDER

Before the Court are the Parties' motions for summary judgment.  (Doc. 33; Doc. 38).  For the following reasons, the Plaintiff's motion is **DENIED**.  The Defendant's motion is **GRANTED in part** and **DENIED in part**.

## I.  FACTS

This is a contract dispute.  The Plaintiff is a Louisiana limited liability company that provides emergency medical services.  (Doc. 37-4).  It is co-owned by Ruby Frederick Ketner Yates, M.D., and Terri Serwacki, citizens of Louisiana and Illinois.  (Doc. 1, ¶ 1; Doc. 34-5 at 39:15-20).  The Defendant ("Hospital") is a Georgia corporation that owns and operates a medical facility in Montezuma.  In August 2010, the Parties entered into a three-year written "Agreement for Emergency Medical Services."  (Doc. 34-2 at 53-72).  Pursuant to the Agreement,[1] the Plaintiff promised to provide professional emergency services for patients in the Hospital's emergency department, as well as a medical director, staff physicians, and midlevel providers.

---

[1] The Plaintiff drafted the Agreement.  (Doc. 34-5 at 100:25-101:14; Doc. 42-1, ¶ 22).

(Doc. 34-2 at 53-56).  In exchange for these services, the Plaintiff would receive the collections from professional fees billed, a base payment from the Hospital of $42,689.00 per month, and supplemental payments if patient volume fell below certain levels.  (Doc. 34-2 at 62-63, § 7).

### A.   Performance Issues

To ensure it was compensated for the medical care it provided, the Hospital directed the Plaintiff's physicians to screen all incoming patients, stabilize them if necessary, and then process them for payment before further treatment.[2]  (Doc. 34-1 at 111:4-113:18; Doc. 34-3 at 121).  Although the Agreement required the Plaintiff to abide by the Hospital's policies and regulations, throughout the relationship the Hospital complained to the Plaintiff by e-mail that its physicians were not performing initial screenings and were providing non-emergency treatment to patients unable to pay. (Doc. 34-2 at 56-57, § 2; Doc. 37-3; Doc. 37-9; Doc. 37-10; Doc. 37-11; Doc. 37-12).

In February 2011, the Hospital sent a letter to the Plaintiff about "outstanding issues" that required attention, particularly the declining number of admissions to the hospital from the emergency room that had occurred during the term of the Agreement. (Doc. 34-1 at 119:5-120:5; Doc. 34-3 at 24).  The Hospital blamed its low patient volume on "physician issues, poor quality, lack of competency and disrespectful behavior towards patients," as well as the failure to perform screening exams.  (Doc. 34-3 at 24).

---

[2] The Hospital had to walk a fine line between complying with federal law and ensuring it got paid for the service it provided.  Pursuant to the Emergency Medical Treatment and Active Labor Act, when a person seeks treatment in the emergency room of a hospital like the one in this case, the hospital must screen him for an emergency medical condition.  42 U.S.C. § 1395dd(a).  If such a condition exists, the hospital must stabilize the patient.  42 U.S.C. § 1395dd(b).  The law was crafted to prevent "patient dumping" – the practice of emergency rooms turning away or transferring to other hospitals indigent patients unable to pay for treatment.  *Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002).

But the Hospital allegedly did not honor its obligations either.  Invoices for the monthly base payment frequently went unpaid, as evidenced by multiple e-mails on this subject the Plaintiff sent to the Hospital over the course of the Agreement.  (Doc. 34-1 at 44:3-25; Doc. 34-3 at 27, 40-42).  In fact, the Hospital concedes it was late paying the Plaintiff throughout the term of their relationship.  (Doc. 34-1 at 43:5-8).  Sometimes it intentionally withheld payment because the Hospital thought the Plaintiff was not performing.  (Doc. 34-1 at 43:12-21).  On other occasions the Hospital contends it could not pay on time because the Plaintiff's poor performance and refusal to conduct preliminary screenings led to a shortage of cash.[3]  (Doc. 34-1 at 47:21-48:13, 107:16-19, 124:5-9; Doc. 34-3 at 31, 45, 127-128).

### B.    Termination of the Agreement

On January 20, 2012, Philip Eastman, the Hospital's CEO, sent an e-mail to Yates indicating the Hospital's desire to terminate the contract:

> We have continued to have problems with our relationship.  We have tried many times to have you correct the deficiencies, but to no avail.  We have just learned that the physicians [sic] compensation is being withheld.  The lack of ER physicians will jeopardize the health and safety of patients, both inpatient and outpatient.  We cannot take such risk.  As a consequence, we believe it is in our best interest to terminate this arrangement.  We will be responsible for the ER department effective 7 a.m. on February 1st.  Your services will not be required after 7 a.m. on February 1st.  We would expect that you will honor your obligation to compensation [sic] these physicians.

(Doc. 34-3 at 22).  Eleven days later, on January 31, 2012, Yates responded to Eastman on behalf of the Plaintiff:

---

[3] The Hospital had its own management difficulties during this time period as it cycled through several different CEOs.  (Doc. 34-1 at 12:18-22).  Moreover, at some point one of those CEOs outsourced the Hospital's business office, which caused the cash flow to "crash."  (Doc. 34-1 at 64:20-65:2).

I am responding to your Jan. 20, 2012 email in which you repudiated the Agreement for Medical Services (the "Contract") between Flint River Hospital (the "Hospital") and Flint Emergency Medical Services, LLC (["]FEMS").  Your repudiation violates the express terms of the Contract and FEMS hereby reserves all of its rights to recover damages arising from this (and other breaches).  As previously discussed, the physicians are being compensated.  Any delay in that compensation is a direct result of the Hospital's failure to timely make the payments under the Contract.  Furthermore, we dispute that FEMS has done anything to jeopardize the health and safety of the patients.

This will also confirm that, beginning 7 am on February 1, 2012, you will be assuming responsibility for the ER at the Hospital.  Again, FEMS contends your removal of FEMS physicians from the ER is a breach of the Contract and we reserve all rights arising from or related to this (and other) breaches of the Contract.

(Doc. 34-3 at 23).  Eastman replied that same day with an e-mail confirming plans to transfer responsibility for the emergency room and noting that it was a "'for clause' [sic] termination."  (Doc. 34-3 at 25).  The Agreement ended February 1, fewer than 30 days from the date of the Hospital's January 20 termination e-mail.  (Doc. 33-2, ¶¶ 24-25; Doc. 40, ¶¶ 24-25).

Among the issues disputed in this case are whether this termination was in accord with the Agreement and the significance of the Hospital's alleged noncompliance with the termination provisions.  Pursuant to Section 11 of the Agreement:

A. **Mutual Termination of Agreement:**  In the event the Hospital and the Corporation shall mutually agree in writing, this Agreement may be terminated upon the terms stipulated by the parties as of the date identified in such notice.

B. **Termination and Cure of Breach:**  Either party may terminate at any time in the event the other party engages in an act or omission constituting a material breach of any term or condition of the Agreement.  The party electing to terminate this Agreement shall provide the breaching party with not less than thirty (30) days advance

written notice specifying the nature of the breach.  The breaching party shall then have thirty (30) days from the date of the notice in which to remedy the breach and conform its conduct to this Agreement.  If such corrective action is not taken within the time specified, this Agreement shall terminate at the end of the thirty (30) day period without further notice or demand.

C. **Termination for Specific Breaches:**  Notwithstanding anything contained herein to the contrary, this Agreement may be terminated for "cause" (as hereinafter defined).  In the event of an occurrence which constitutes "cause", the non-breaching party must give thirty (30) days prior written notice of a violation of this Agreement to the breaching party and allow reasonable time for cure of the violation which shall be specified in the written notice of violation.  In the event the violation is cured, the Agreement shall continue in full force and effect as if no violation had occurred.  In the event the violation is not cured, then the non-breaching party may give the breaching party a written notice of termination as allowed for in this Agreement.

(Doc. 34-2 at 64-66, § 11).

## C.    Notice and Invoice Deviations

Further complicating their relationship was the Parties' practice of straying from the Agreement's prescribed manner for providing notices, payments, and invoices to one another.  Section 14 describes how the Parties were supposed to operate:

**NOTICES**:  All notices, payments and other communications required or permitted under this Agreement shall be deemed given and received when delivered in person, when delivered to an overnight courier, or three days mailing if sent by first class United States mail, postage prepaid, certified with return-receipt requested, and addressed as follows:

If to the [Hospital]:   Flint River Hospital
509 Sumter Street
Montezuma, Georgia 31063
Attention: Frank Schupp, Chief Executive Officer

> If to the [Plaintiff]:   Flint Emergency Medicine LLC
> 122 Carlyle Avenue
> Belleville, Illinois 62220
> Attention: Terri L Serwacki, Chief Executive Officer
> and/or Frederick K. Yates, M.D., Corporate Medical
> Director

(Doc. 34-2 at 67, § 14).  This section was never modified in writing.  (Doc. 38-2, ¶ 5;

Doc. 42-1, ¶ 5).  However, at Serwacki's verbal request, the Hospital sent its payments

to a Louisiana Post Office box rather than the Illinois address specified in the

Agreement.  Similarly, the February 2011 letter the Hospital sent to the Plaintiff was

mailed to Louisiana.  (Doc. 34-1 at 36:3-6, 212:15-213:5; Doc. 34-5 at 84:2-17, 85:1-8).

Moreover, many of the communications the Parties contend qualified as notices to one

of the other's nonperformance were sent via e-mail.

Meanwhile, the Plaintiff never sent or delivered any notice or invoice to the

Hospital in strict compliance with the Agreement.  (Doc. 38-2, ¶¶ 6-10; Doc. 42-1, ¶¶ 6-

10).  Invoices were required "other communications" pursuant to Section 14, but none of

the invoices at issue in this case were treated as such.  (Doc. 38-2, ¶¶ 12, 14; Doc. 42-

1, ¶¶ 12, 14).  Rather, they were e-mailed to the Hospital.  (Doc. 34-1 at 213:6-13; Doc.

34-5 at 54:14-16).  Furthermore, the invoices were all sent on the letterhead of another

company, Genesis Emergency Medicine Services, LLC,[4] and were signed by Serwacki

as the Genesis CEO.  Genesis was not a party to the Agreement and is not a party to

this action.  (Doc. 34-2 at 41-50; Doc. 34-5 at 36:21-23; Doc. 38-2, ¶¶ 15-19; Doc. 42-1,

---

[4] According to Serwacki, Genesis is the Plaintiff's "parent company."  She and Yates co-own
Genesis, which also contracts with hospitals to provide physicians and management for
emergency departments.  (Doc. 34-5 at 36:21-24, 44:4-10, 57:7-9).  However, aside from the
shared ownership and fact that Genesis was Yates's and Serwacki's "first corporation," its exact
relationship to the Plaintiff is not clear.  There are no oral or written agreements between the
two companies.  (Doc. 34-5 at 57:1-6).

¶¶ 15-19).  Despite the Plaintiff's departure from the express terms of Section 14, the Hospital made more than $650,000 in payments on 30 separate occasions between August 2010 and January 2012 on invoices submitted in this fashion.  (Doc. 34-1 at 22:1-11; Doc. 34-3 at 19-21).

### D.     The Hospital's Retention of Physicians

After the Agreement was terminated, the Plaintiff alleges several physicians and a nurse practitioner who had been employees[5] of the Plaintiff continued to work at the Hospital.  Section 12 of the Agreement anticipated this possibility and set conditions whereby one party could employ the other party's physician or midlevel provider:

> **OFFERS TO PERSONNEL**:  Both parties agree and covenant that neither will directly or indirectly make offers of contracts of employment or offers of contracts for services with the other party's non-physician employees or physicians, or with any partnership, corporation, association or other business entity through which such non-physician employees or physicians may render services during the term of said contract or employment without mutual agreement of the parties prior to such offer. [The Plaintiff] exempts any physician or midlevel having held privileges at [the] Hospital prior to this Agreement from this covenant.  The Plaintiff may enter into contractual agreements with physicians and midlevel providers to render Emergency Services required by this Agreement subject to [the Hospital's] approval which shall not be unreasonably or illegally withheld.
>
> In recognition that [the Plaintiff] expends substantial resources and efforts to make qualified physicians and mid-level providers available to serve as [the Plaintiff's] representatives, [the Hospital] agrees that during the term of this Agreement and including the first one-year extension thereof, [the] Hospital will not directly or indirectly (including, without limitation, through a controlled or contracted affiliate or entity) solicit, retain, employ, contract with or otherwise engage or be the beneficiary of the professional services of any [of the Plaintiff's] representatives or physicians who were presented to [the] Hospital by [the Plaintiff].

---

[5] It is neither clear nor material whether the physicians were employees or independent contractors.  However, for ease of reference, this Order refers to them as employees.

(Doc. 34-2 at 66, § 12).  All of the employees the Hospital retained had privileges at the hospital or worked there prior to the onset of the Agreement.  (Doc. 38-2, ¶¶ 36, 38; Doc. 42-1, ¶¶ 36, 38).

### E.    The Complaint

Fewer than two months after the Agreement was terminated the Plaintiff filed this lawsuit alleging breach of contract.  (Doc. 1).  The Plaintiff contends the Hospital breached the terms of the Agreement by:  (1) failing and refusing to pay monthly payments; (2) terminating the Agreement without providing the requisite notice and opportunity to cure; (3) failing to pay for the tail coverage costs of services provided by physicians and the Plaintiff upon termination; and (4) retaining, employing, or contracting with physicians and other service providers who the Plaintiff "presented" to the Hospital.  (Doc. 1, ¶¶ 29-32).

In response, the Hospital filed a counterclaim for breach of contract against the Plaintiff.  (Doc. 9 at 8).  The Hospital asserts the Plaintiff did not abide by the terms of the Agreement when it:  (1) failed to provide a medical director; (2) failed to implement a performance improvement plan; (3) failed to participate in teaching programs; (4) failed to provide continuing medical education for other providers; (5) failed to comply with the Emergency Medical Treatment & Active Labor Act; (6) failed to comply with the Hospital's policies, and state and federal laws, regulations, and accreditation standards; (7) failed to abide by the Hospital's bylaws; (8) failed to comply with Conditions of Participation and Hospital Standards; and (9) failed to timely pay providers or failed to pay them at all.  (Doc. 9 at 9-11).

## II.  DISCUSSION

### A.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  The movant must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing…relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *Am. Bankers Ins. Grp. v. United States,* 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir. 1984).  The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *Am. Bankers Ins. Grp.,* 408 F.3d at 1331.

### B.     Applicable Law

This is a lawsuit between diverse parties.  Accordingly, the Court is bound to apply substantive state law.  *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1445 (11th Cir. 1998) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  The Agreement contains a choice of law provision that specifies the document's construction and interpretation shall be governed by the law of Georgia.  (Doc. 34-2 at 69, § 19.C.).  In Georgia, contract interpretation is a question of law for the Court.  O.C.G.A. § 13-2-1.

### C.     The Plaintiff's Motion for Summary Judgment

The Plaintiff first moves for summary judgment on the Hospital's counterclaim, contending the Hospital is procedurally barred from suing for breach of contract because it unilaterally terminated the Agreement without providing notice and an opportunity to cure as required by Section 11.  The motion is based solely on this legal proposition.  In further reliance on this theory, the Plaintiff also moves for partial summary judgment on its claims against the Hospital for unpaid invoices, arguing the

improper termination bars the Hospital from raising the Plaintiff's nonperformance as a defense.

The Plaintiff's argument rests principally on *In re Colony Square Co.*, 843 F.2d 479 (11th Cir. 1988), a bankruptcy-related case interpreting Georgia contract law. According to *Colony Square*:

> Contracts which set forth the manner in which a party must exercise a remedy in the event of a default must be strictly adhered to. If a party does not comply with the requirements of the contract's default clause, it forfeits its rights under the clause. Accordingly, when a default clause contains a notice provision, it must be strictly followed, and summary judgment is warranted if notice is not given.

*Id.* at 481 (internal citations removed). For further support, both *Colony Square* and the Plaintiff look to *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 369, 203 S.E.2d 587, 593 (1973). *Orkin* held that "[t]he failure to give notice *as required*...is an independent bar to the maintenance of a successful cause of action on the contract." *Id.* (emphasis added). *Colony Square* and *Orkin* also support another case cited by the Plaintiff, *Alliance Metals, Inc. of Atlanta v. Hinely Industries Inc.*, which considered notice and cure requirements in a Pennsylvania contract. 222 F.3d 895 (11th Cir. 2000). Finally, the Plaintiff cites *Pillar Development, Inc. v. Fuqua Construction Co.*, which affirms that *Orkin* applies "[w]here a contract contains provisions requiring written notice of a claim for breach." 284 Ga. App. 858, 861, 645 S.E.2d 64, 66 (2007).

Thus, as a general proposition, failure to comply with a contract's notice and cure requirements can bar an action for breach of contract. However, this general principle does not apply here because the Agreement does not require notice and an opportunity to cure prior to filing a lawsuit or establishing the existence of a breach. *Orkin*, *Colony*

*Square*, *Alliance Metals*, and *Pillar* all construed contracts with notice and cure terms that were prerequisites to such events.  In *Orkin*, a homeowner sued an extermination company that treated his home for termites when it later became severely infested.  The general terms and conditions of the guarantee the company provided included these paragraphs:

> 5. Any claim for breach of any Guaranty shall be made forthwith in writing to said Orkin Exterminating, Inc., 2170 Piedmont Road, Atlanta, Georgia, 30324.

> 6. No suit shall lie hereunder unless the provisions of Paragraph 5 have been complied with and unless brought within one (1) year after the making of said written demand.

130 Ga. App. at 364, 203 S.E.2d at 590.  Thus, the contract expressly barred suit without first making a claim for breach in writing.

In *Colony Square*, a section of the contract at issue required Colony Square to provide Prudential, the insurance company managing Colony Square's property, with written notice of any alleged default and 30 days to cure the default.  If the default was not cured, the contract provided that Colony Square could terminate the lease or sue for specific performance.  843 F.2d at 480-81.  In the context of the contract as a whole, the court construed this provision "as imposing notice, opportunity to cure, and in some instances, a suit for specific performance *as conditions precedent to an action for damages.*"  *Id.* at 481 (emphasis added).  The court found that Colony Square failed to give Prudential notice and an opportunity to cure and, citing *Orkin*, determined that failure to be an independent bar to Colony Square's contract claim.  *Id.*

*Alliance Metals* applied Pennsylvania law to a non-competition provision in an employment contract.  An employee claimed constructive discharge from his employer,

Alliance Metals, and began operating a competing business in the same market.  222

F.3d at 898-99.  The employee's conduct violated the terms of the non-compete

agreement.  *Id.* at 899.  However, when sued by his former employer, he argued his

constructive discharge was a material breach of the employment contract that excused

his noncompliance with the non-compete clause.  *Id.* at 903.  The Eleventh Circuit

disagreed because the contract specifically required a notice and cure opportunity

before the employer's misconduct was a breach that voided the non-compete provision:

> [The non-competition provision] shall be null and void in the event…the
> Employer materially breaches the terms of this agreement and fails to cure
> any such material breach within thirty (30) days after notice from the
> Employee specifying the breach and requiring it to be cured.

*Id.* at 902.  The employee did not comply with this notice and cure requirement and was

therefore barred from claiming the non-competition provision could not be enforced.

Similarly, in *Pillar*, the contract expressly mandated notice of breach as a

prerequisite to seeking a remedy.  The defendant made various warranties regarding

the property it had agreed to sell the plaintiff, and the contract provided specific

remedies in the event of breach.  The plaintiff could:

> [(a)] terminate this Agreement by written notice to [the defendant]
> whereupon the Earnest Money shall be returned to [the plaintiff] and no
> party hereto shall have any further rights or obligations hereunder; or
> (b)…waive such untrue warranties and covenants and proceed with
> Closing under the terms and conditions of this Agreement with no
> reduction in the Purchase Price.

284 Ga. App. at 860, 645 S.E.2d at 67.  Section 10 of the contract further stated,

according to the Georgia Court of Appeals, that

> in the event of a default or breach by [the plaintiff or defendant], the
> defaulting party shall be entitled to written notice of the specific default or

breach and of a 15-day period after receipt of the notice to cure the default
or breach.  Section 10 further provides that, if default or breach is not
corrected by the defaulting party within the 15-day period, then "an event
of default shall have occurred" and the nondefaulting party shall be
entitled to the following rights and remedies:  (1) If [the defendant]
defaulted, then [the plaintiff] was entitled to either terminate the agreement
and receive a refund of the earnest money, or seek specific performance;
(2) If [the plaintiff] defaulted, then [the defendant] was entitled to retain the
earnest money as liquidated damages and render the agreement null and
void, or seek specific performance.

*Id.* at 860-61, 645 S.E.2d at 67.  Believing the defendant would not deliver the property

as warranted, the plaintiff refused to close the deal.  *Id.* at 859, 645 S.E.2d at 66.  The

plaintiff then sued to recover earnest money held by the defendant.  *Id.* at 858, 645

S.E.2d at 65.  Citing *Orkin*, the court concluded the plaintiff failed to comply with the

contract's notice requirement and could not rely on the defendant's alleged breach as a

basis for refusing to close.  This prevented the plaintiff from demanding a refund of the

earnest money.  *Id.* at 861, 645 S.E.2d at 67.

The common thread in all of these cases is that the contracts at issue either

spelled out the remedies available in the event of breach and specifically made notice

and cure opportunities prerequisites to seeking these remedies, or they declared

breaching activity was not an actionable "breach" until notice and cure opportunities

were provided.  But unlike *Orkin*, *Colony Square*, *Alliance Metals*, and *Pillar*, the

Agreement does not "set forth the manner in which a party must exercise a remedy in

the event of a default."  *Colony Square*, 843 F.2d at 481.  Rather, the Agreement in

Section 11 sets forth directions for how the contract may be properly terminated,

imposing notice and cure requirements as conditions precedent to a proper termination.

But Section 11 addresses *only* the Agreement's term and termination.  It does not

impose notice and cure requirements that must be met before a party may bring or defend a lawsuit for breaching the Agreement.  Nor does it condition the existence of a breach or the availability of a legal remedy on either party's compliance with the termination notice and cure requirements.

Thus, a party that terminates the Agreement without abiding by Section 11 breaches the Agreement with respect to the manner of its termination, but that party does not preclude itself from asserting other claims for breach pursuant to the Agreement.  Nor has it undercut its ability to raise its opponent's breaches as a defense. It simply has opened itself to liability for breaching Section 11 through an improper termination.  Had the Agreement contained a condition that a party could not seek a legal remedy for breach without first notifying the breaching party of its misconduct, or a condition providing that breaching activity was not a "breach" without notice and an opportunity to cure, or even made proper termination a condition precedent to filing suit, then *Orkin*, *Colony Square*, *Alliance Metals*, and *Pillar* would likely apply.  But the Agreement contains no such provision, and without it, these cases are inapposite.

In this case, the Plaintiff's motion for summary judgment as to the Hospital's counterclaim and for partial summary judgment as to its breach of contract claim is premised entirely on the argument that the Agreement contains a broadly applicable notice and cure provision that creates a procedural bar for the Hospital.  It does not. Consequently, the Plaintiff's motion is **DENIED**.

**D.     The Hospital's Motion for Summary Judgment**

**1.    Notice of Breach**

The Hospital "could not agree more" with the Plaintiff that giving proper notice is a condition precedent to maintaining a breach of contract action under the Agreement, and it accepts *Orkin* and *Pillar* as controlling precedent.  (Doc. 38-1 at 9).  Applying the Plaintiff's logic, the Hospital seeks summary judgment on the Plaintiff's claim by alleging the Plaintiff did not correctly notify the Hospital of its breaching conduct.  However, as discussed above, the Agreement does not require either party to give notice of breach prior to suing on that alleged breach.  Unlike the Plaintiff, the Hospital cites Section 14 as the source for its claimed notice requirement.  But Section 14 does not speak to *when* notice is required.  It merely explains *how* notice and other communications should be made *if* they are "required or permitted under [the] Agreement."  (Doc. 34-2 at 67, § 14).  The Plaintiff had no affirmative obligation under the Agreement to give the Hospital notice of its claims for breach.

Moreover, the Court is not persuaded by the Hospital's argument that the Plaintiff's claim is barred because the Plaintiff did not strictly comply with Sections 7 and 14 when it e-mailed invoices for monthly subsidy payments on the letterhead of Genesis Emergency Medicine Services, LLC.[6]  "It is well established that a party to a contract may waive a contractual provision for his or her benefit."  *Forsyth Cnty. v. Waterscape Servs., LLC*, 303 Ga. App. 623, 630, 694 S.E.2d 102, 109 (2010) (citation omitted); *see also* O.C.G.A. § 13-4-4 (where parties depart from contract terms and pay money under

---

[6] Section 7 of the Agreement discusses how the Hospital will compensate the Plaintiff and when invoices and payments are due.  (Doc. 34-2 at 62-63).  The Hospital suggests the Plaintiff's invoices were not timely sent.  The Plaintiff disputes this, creating a question of fact for the jury. (Doc. 42-1, ¶ 13).

such departure, they must give notice of their intent to rely on the exact terms before they can recover for failure to pursue the letter of the agreement). "'A waiver may be express, or may be inferred from actions, conduct, or a course of dealing.'" *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 562, 610 S.E.2d 92, 99 (2005) (quoting *Smith v. Gordon*, 266 Ga. App. 814, 815, 598 S.E.2d 92, 93 (2004)).

Here, despite the Plaintiff's departure from the strict terms of the Agreement, there is evidence that the Hospital made more than $650,000 in payments on 30 separate occasions between August 2010 and January 2012 on invoices submitted in this fashion.  (Doc. 34-1 at 22:1-11; Doc. 34-3 at 19-21).  There is no evidence that during the Agreement the Hospital objected to the manner, method, or form in which the invoices were provided to it.  If this is not waiver as a matter of law, it is more than sufficient to create a jury question as to whether the Hospital, by its actions, conduct, or course of dealing, waived strict compliance with Section 14 and the manner in which invoices had to be presented.[7]

Accordingly, the Court will not dismiss the Plaintiff's claims based on its alleged failure to notify the Hospital of its various breaches.  The Hospital's motion for summary judgment on these grounds is **DENIED**.

## 2.   Retention of Physicians Pursuant to Section 12

The Hospital contends summary judgment is proper on the Plaintiff's claim that the Hospital breached the Agreement when it employed several doctors and a nurse practitioner who had been employed by the Plaintiff.  Section 12 of the Agreement discusses conditions under which this is allowed.

---

[7] The Agreement purports to contain a contractual provision against waiver.  (Doc. 34-2 at 69, § 19.I.).  But "even a contractual provision against waiver may be waived by conduct." *Crawford v. First Nat'l Bank of Rome*, 137 Ga. App. 294, 295, 223 S.E.2d 488, 490 (1976).

In the first paragraph of Section12, the Parties agreed that neither would offer employment to each other's physicians or providers while those physicians or providers worked for the other Party.  (Doc. 34-2 at 66).  However, the Agreement specifically exempts from this prohibition physicians and midlevel providers who held privileges with the Hospital prior to the Agreement.  (Doc. 34-2 at 66).  Accordingly, the Hospital contends this exemption allowed it to employ anybody with prior privileges at the Hospital.  The second paragraph of Section 12 states that during the term of the Agreement and the first one-year extension thereof the Hospital agreed to not employ physicians or providers "presented" to it by the Plaintiff.  (Doc. 34-2 at 66).  "Presented" is not defined.  The Plaintiff reads this paragraph as a separate and distinct restriction on the Hospital that wipes out the exemption in the first paragraph.  Under the Plaintiff's interpretation, even if a doctor previously held privileges at the Hospital, the Hospital could not hire him if the Plaintiff had later "presented" that doctor to the Hospital during the term of the Agreement.

The Hospital's interpretation is more persuasive.  Section 12 clearly is not intended to prevent the Hospital from hiring doctors with whom it had relationships prior to the Agreement's consummation.  That is the whole point of including the prior privileges exemption.  To accept the Plaintiff's argument that this exemption is negated if the Plaintiff later "presents" those same doctors to the Hospital renders the provision meaningless.  The exemption then becomes surplusage, which violates basic assumptions about how contracts are drafted.  *See, e.g.*, *Pomerance v. Bershire Life Ins. Co. of Am.*, 288 Ga. App. 491, 494, 654 S.E.2d 638, 641 (2007) (quotation marks

omitted) ("[I]t is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless").

Further, the Hospital's interpretation is fully consistent with the verb "present." Accepting the plain meaning of the word advanced by the Plaintiff – to "put forward" or to "submit" – the context in which "present" is used here clearly implies situations where the Plaintiff puts forward or submits people who are not already known to or in a relationship with the Hospital.  That is, the first part of the sentence prohibiting the Hospital from employing "presented" physicians or providers presumes these will be individuals on whom the Plaintiff has "expend[ed] substantial resources and efforts" to find and make available to work at the Hospital.  (Doc. 34-2 at 66).  There is no such investment when the Plaintiff "presents" employees already affiliated with the Hospital. In any event, to whatever extent there is ambiguity in Section 12, this ambiguity must be construed against the Plaintiff because the Plaintiff drafted the Agreement.  *See* O.C.G.A. § 13-2-2(5); *Hertz Equip. Rental Corp. v. Evans*, 260 Ga. 532, 533, 397 S.E.2d 692, 694 (1990).  Accordingly, it is clear the Agreement permits the Hospital to hire and retain any physicians and midlevel providers who previously held privileges there.

Here, the Hospital asserts that "[a]ll of the doctors hired by the Plaintiff during the term of the Agreement had privileges at the hospital prior to the commencement of the Agreement."  (Doc. 38-2, ¶ 38).  The Hospital further states that the nurse practitioner hired by the Plaintiff worked in the hospital's emergency room immediately prior to the commencement of the Agreement.  (Doc. 38-2, ¶ 36).  The Plaintiff admits these facts are true.  (Doc. 42-1, ¶¶ 36, 38).  It merely argues that pursuant to the Agreement, the

prior privileges exemption did not permit them to continue working for the Hospital because they had subsequently been "presented" by the Plaintiff.  As discussed above, this is not a proper interpretation of Section 12.  All of these employees are covered by the prior privileges exemption because their working relationship with the Hospital pre-existed the Agreement.  The Hospital was allowed to employ any of them beyond the term of the Agreement.

Consequently, summary judgment is **GRANTED** to the Hospital on the Plaintiff's claim for breach of Section 12.

### 3.    Volume Subsidy Payments

The Plaintiff alleges it is owed $322.50 in subsidy payments for low patient volume.[8]  This is based on an e-mailed invoice the Plaintiff sent February 2, 2011 after the number of patients fell below the level guaranteed in the Agreement.  (Doc. 34-5 at 54:4-11; Doc. 35-33).  The Hospital never paid the invoice and continues to dispute its obligation to pay given the Plaintiff's alleged nonperformance.  Despite the relatively small amount of money, this is a factual dispute that must be resolved by a jury.

Accordingly, summary judgment as to the Plaintiff's claim for breach as it relates to the Agreement's volume subsidy provision is **DENIED**.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for summary judgment (Doc. 33) on the Hospital's counterclaim and for partial summary judgment on its breach of contract claim against the Hospital is **DENIED**.  The Hospital's motion for summary judgment (Doc. 38) on the Plaintiff's breach of contract claim for the Hospital's retention

---

[8] The amount of damages the Plaintiff says is associated with this claim has fluctuated during the course of litigation.  It has been as high as $43,989.00.  (Doc. 34-5 at 9:7-14).  But the Plaintiff now concedes the correct amount is $322.50.  (Doc. 42 at 18).

of physicians is **GRANTED**.  As to the Plaintiff's remaining claims for breach of contract,

the Hospital's motion for summary judgment is **DENIED**.

      **SO ORDERED,** this 2nd day of October, 2013.


                                        S/ Marc T. Treadwell
                                        MARC T. TREADWELL, JUDGE
                                        UNITED STATES DISTRICT COURT